**Glenda M. HALL, Plaintiff,**

**Mercedes Jackson, Curator of Glenda M. Hall, Appellant,**

v.

**James Brent FREESE and Altruk Freight Systems, a subsidiary of Roco International, Defendants-Appellees.**

No. 83–4254.

United States Court of Appeals, Fifth Circuit.

July 9, 1984.

---

Joseph W. Thomas, New Orleans, La., John L. Walker, Jackson, Miss., for appellant.

Joe O. Sams, Jr., Thomas L. Kesler, Columbus, Miss., for defendants-appellees.

Before CLARK, Chief Judge, JOLLY and DAVIS, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

The appellant, Mercedes Jackson, argues on behalf of her daughter and ward, Glenda Hall, that Hall is entitled to a new trial of her personal injury suit because of the inadequacy of the verdict. She further argues that Hall is entitled to a new trial on the basis of prejudicial remarks made by the defense counsel. We reverse the judgment of the district court and remand the case for a new trial.

I.

In November 1979, Hall, a twenty-seven-year-old black woman, was injured in a traffic accident in north Mississippi. The van in which she was riding was struck by a truck driven by James Freese and owned by Altruk Freight Systems. Hall was thrown against the van's windshield when the truck struck the van from the rear. She sustained a blow to her forehead and a severe cut. She was taken to a local hospital where the doctors determined that she had suffered a concussion. Hall stayed in the hospital for three days before returning to New Orleans, where she lived.

After returning to New Orleans, Hall consulted a neurologist because she was suffering severe headaches. Hall returned to work a few weeks after the accident, but she continued to seek treatment, visiting a number of different doctors from whom she requested prescription medicines to relieve her headaches. Over a period of several months, Hall accumulated approximately fifteen different prescriptions.

Eventually, Hall's doctors referred her to a psychiatrist because she had become psychotic. She had become unable to work or to care for herself and her thirteen-year-old daughter, and she often remained in her bedroom for days at a time, afraid to leave it. In short, by the time this case was tried, she was totally disabled by her mental illness.

In February 1981, Hall filed this diversity suit against Freese and Altruk, claiming that she had suffered damages of $2,500,-000 because of the accident. Hall claimed that she had become completely disabled by epilepsy and psychosis caused by damage to her brain sustained in the accident. In early 1983, just before the case was tried, Hall's mother, Mercedes Jackson, was appointed Hall's curator and was substituted for Hall as plaintiff.

Altruk [1] admitted that it was liable for Freese's negligence, which caused the accident, and for the damages Hall suffered as a result of the accident. Altruk conceded that Hall had sustained physical injuries which required her to be hospitalized and which caused her considerable pain. The main issue at trial was whether Hall's psychosis and epilepsy were triggered by the accident.

At trial, Hall presented the testimony of seven expert witnesses, including the surgeon who treated her back and neck injuries; two neurologists and two psychiatrists, all of whom had treated Hall; a nurse, who testified about the cost of providing nursing care; and an economist who testified about the economic effects of Hall's permanent disability. All of the medical experts except one psychiatrist testified by deposition.

Dr. Martin, a neurologist who examined Hall several times between February 1980 and May 1981, testified that she suffered from post-traumatic depression and neurosis. He stated that Hall's injury was not physical or neurological, but emotional, and that Hall was not permanently disabled

"from a neurological standpoint." Martin referred Hall to a psychiatrist for treatment because she appeared to be "seriously depressed" and was "not responding well to anti-depressant medication."

Dr. Weisberg, another neurologist, stated that Hall was "acutely psychotic" when he first examined her in January 1981, and was "not capable of independent living, ... [or] caring for herself ...." Hall constantly hallucinated and did not know what day or month it was when he examined her. In addition, Dr. Weisberg found that Hall was experiencing major psychomotor seizures approximately two times per week, and that these seizures could have resulted from the accident. Her psychosis, however, in his opinion, was "an unlikely result of [the] accident ...." Although he stated that he could not rule out the blow to the head as the cause of Hall's psychosis, Dr. Weisberg believed that there were "more likely explanations for the acute psychotic disorder, one being schizophrenia." During cross-examination, Dr. Weisberg testified that he could not say with reasonable medical certainty that Hall's psychosis or hallucinations were proximately caused by the accident, but on redirect examination he said, "I believe it is more probable than not that her injuries resulted from the accident."

Hall's psychiatrist, Dr. Cohen, testified that Hall suffered from hallucinations, was severely depressed and had contemplated suicide. He stated, "My impression ... [was] that she was psychotic, that she was not functional, and that, as far as I could tell, the psychosis was triggered or precipitated by the accident of [19]79. At least I found no information that would give another explanation." Dr. Cohen testified that Hall was suffering from a multiple personality disorder and was completely disabled by this condition.

Dr. Cox, a psychiatrist who examined Hall in order to assess her competency to stand trial for criminal charges brought

---

**1.** On the first day of trial, the district judge stated that Freese was no longer a party to the lawsuit. We find no other indication in the record that the cause against Freese was dismissed, but we assume this to have been the case.

against her in 1981, did believe that Hall's psychosis was related to the accident: "My opinion, [is that] she has posttraumatic psychomotor epilepsy, and I think that she also has a psychosis, a psychotic disturbance, which is secondary to the chronic effect of the psychomotor epileptic disorder that she has." Dr. Cox was the only medical expert who testified in person at trial. He disagreed with Dr. Cohen's diagnosis that Hall had a multiple personality disorder and with Dr. Weisberg's suggestion that Hall was schizophrenic, but he did testify that progressively worsening psychiatric symptoms such as those Hall exhibited had been scientifically linked to head injuries. He stated "with reasonable medical certainty" that Hall's condition was a result of the November 1979 accident.

Mrs. Jackson, Hall's mother, testified that she has assumed responsibility for the care of both Hall and her daughter. Hall frequently becomes hysterical and has nightmares about the accident. In addition, she experiences epileptic seizures. Hall often spends three or four days in a row in her bedroom, afraid to leave it. Mrs. Jackson is a nurse's aide, and she must make sure that Hall takes the drugs prescribed for her.

It is clear from the evidence presented at trial that Hall is a severely disabled woman. She is unable to care for herself or her daughter and requires almost constant supervision. Expert testimony showed that her special damages, that is, lost earnings plus future medical expenses, exceed $500,000.

Having been presented with the evidence summarized above, the jury returned a general verdict for Hall of $55,000. Hall moved for a new trial, arguing to the district court that such a low verdict in the face of the overwhelming evidence of Hall's disability must have been the product of passion or prejudice. The district court denied the motion for a new trial, and Hall appealed.

## II.

Hall makes to this court essentially the same argument she made to the district court in support of her motion for a new trial. First, she contends that the jury verdict is clearly inadequate and against the great weight of the evidence. Second, she argues that the jury returned such a low award in her favor because it was motivated by racial prejudice, inflamed by remarks made by defense counsel.

### A.

■ Hall argues that the jury verdict clearly is insufficient to compensate her for the injuries she proved at trial. We agree that the award of $55,000 seems inadequate considering the strength of the evidence presented by Hall.

In the first place, Hall presented uncontradicted evidence that she suffered severe physical injuries in the accident. These injuries included a concussion, a facial laceration that left a permanent scar on her forehead, and back and neck injuries. She experienced considerable pain for several months after the accident, and her doctors continued to prescribe pain-relieving drugs for her. Since the accident Hall has begun to suffer epileptic seizures. All of the expert witnesses testified that Hall's epileptic seizures probably resulted from the blow to the head which she received in the accident.

Based solely on this uncontradicted evidence, Hall suffered injuries for which the $55,000 award seems to us significantly inadequate. The evidence presented at trial clearly showed that the costs of treating Hall's seizures and continuing pain are high, and the defense presented no evidence to support mitigation of these damages. Moreover, the evidence that Hall's completely debilitating psychosis was the result of the accident, although not conclusive, was certainly strong. Indeed, the only two psychiatrists who testified were of the opinion that her psychosis was triggered by the accident.

Given the strength of the plaintiff's evidence on causation and the uncontradicted testimony that she is totally disabled and will incur enormous expenses over her life-

time as a result of her disability, we think the jury verdict of $55,000 strongly indicates that the jury's deliberation in this case was not impartial. We look, then, to Hall's allegations that the low damage award was the result of improper conduct on the part of Altruk's defense attorney.

### B.

Hall cites six instances of alleged misconduct on the part of Altruk's defense counsel. All occurred either in opening or closing argument and are summarized here:

(1) In opening argument, the defense attorney said, "We will show ... that Clarence Dalcour [a business associate of Hall who was also involved in the accident] was not only a business associate and a social friend of Miss Hall, but that he was a married man, seeing Miss Hall on the side."

There is no evidence in the record to support the statement that Dalcour was married, although he did admit that he and Hall had "a love affair."

(2) Also in opening argument, the defense attorney stated, "You are going to hear evidence ... that there are other causes of Miss Hall's problems. Among those, use of illegal drugs."

Hall admitted taking valium which was not prescribed for her on one occasion. She also stipulated that she took large quantities of prescription drugs.

(3) In closing argument, the defense attorney commented on the fact that Hall's attorney purchased large quantities of prescription drugs for her.

(4) In referring to a deposition taken from Hall in Oxford, the defense counsel mentioned that she "flew up in [a] private plane from New Orleans."

There was no evidence to support this statement.

(5) The defense attorney urged the jury not to return a large verdict for Hall, saying, "This isn't New Orleans. This isn't San Francisco or Chicago or New York or Miami .... This is Oxford, Mississippi, on a March morning, and we didn't leave our brains at home when we left there this morning."

(6) Again, in closing argument, the defense attorney stressed the amount of prescription drugs Hall took and the fact that her attorneys paid for them: "It's a wonder she's not pickled with the amount of drugs that they gave her."

Hall contends that the defense attorney made these remarks in an attempt to appeal to the racial prejudices of the jury members and to place in their minds certain unfavorable stereotypes of black people. Altruk does not deny that some of the statements of fact made at trial were not supported by evidence. It argues, though, that, read in context, none of the statements cited by Hall was unduly prejudicial to her. Altruk denies Hall's allegation that it sought to invoke racial prejudice in the minds of the jurors.

■ Our review of the entire record convinces us that the district court abused its discretion in refusing to grant Hall's motion for a new trial because we are convinced that the verdict returned by the jury was inconsistent with substantial justice. We cannot say that the remarks summarized above were made with an intent to invoke racial prejudice. Undoubtedly, however, the defense attorneys made the remarks to prejudice the jurors against Hall and her attorneys. The strategy of the defense was to characterize Hall as a woman who had flouted respect for marriage vows, who had used illegal drugs, and who was trying to take advantage of the good people of rural northern Mississippi. The defense attorneys emphasized that Hall and her attorneys had flown in a private airplane from New Orleans (big city far away) to Oxford (small hometown). Even though out-of-town plaintiffs and out-of-town lawyers frequently have been the victims of this sort of trial tactic, the misconduct of the defense attorneys in this case seems to us especially serious and unfair. It has no place in a federal court.

In our review of this case, we have found that Hall's citations to misconduct at the

trial generally are well founded. At oral argument in this appeal, Altruk's attorney admitted not only that the remarks about the private airplane were false, but that there had been no reason for him to have conjectured that Hall might have flown to Oxford in a private airplane. In other words, the statement was made for no reason other than to unfairly prejudice the jury. Similarly, there is no evidence in the record that indicates any improper conduct on the part of Hall's attorneys in purchasing prescription drugs for an incompetent and destitute client. Most disturbing to us, however, are the repeated references to the use of drugs, legal and illegal, by Hall, implying and expressly suggesting this to be the cause of Hall's psychosis. The only evidence that Hall used illegal drugs is her admission that she accepted one valium tablet given her by a neighbor when she was unable to sleep. The defense presented absolutely no evidence to support its suggestion that Hall's disability was caused by the use of drugs. In fact, the only opinion expressed by any witness in this regard was that Hall's condition was not caused by drug use. The evidence did show that Hall took a large quantity of prescription drugs, but did not establish that any of these drugs was prescribed improperly. Under the circumstances, the defense attorneys' repeated references to drug use as the probable source of Hall's disability were wholly unjustified and were unfairly prejudicial to Hall's case. Finally, we do not interpret the remark about Oxford, Mississippi, as an appeal to racial prejudice. However, we do think that in the light of other remarks by defense counsel this remark was calculated to prejudice the jurors against Hall as a non-resident of northern Mississippi. This remark, perhaps not improper standing alone, serves as one more demonstration of the nature of the tactics which Altruk's attorneys employed in this case.

■ In this case, however, we are concerned almost as much with the lack of objection by plaintiff's counsel as we are by the improper tactics by defense counsel. There are strong policy reasons for our rule that improper argument may be the basis for a new trial where no objection has been raised only "where the interest of substantial justice is at stake." *Edwards v. Sears, Roebuck & Co.*, 512 F.2d 276, 286 (5th Cir.1975). *Accord, Schleunes v. American Cas. Co. of Reading, Pa.*, 528 F.2d 634, 638 (5th Cir.1976). Here counsel clearly should have objected. Though certainly permissible, it was not the duty of the trial court to step into the trial on the basis of these remarks, while counsel sat idly by. A timely objection would have given the district judge the opportunity to correct the error and would have obviated the necessity for a new trial. We are therefore keenly aware of the importance of the stringent requirement for a timely objection to preserve such error for appeal.

Nevertheless, we have concluded that substantial injustice has been done in this case and that reversal is required. There is no doubt that the plaintiff is severely and totally disabled. The disability will most probably last a lifetime. Even though there was testimony from the neurologists that Hall's psychosis did not result from a physical, as opposed to an emotional, injury, both psychiatrists testified that her psychosis was triggered by the accident. The defendants offered no psychiatric evidence to refute these experts' opinions. Furthermore, the evidence that the plaintiff suffered serious physical injuries, pain and suffering, both physical and mental, as a result of the accident was uncontradicted. The epileptic seizures which the plaintiff suffers were shown, without contradiction, to be caused by the accident. The epilepsy is likely to last a lifetime. Yet the jury awarded Hall only $55,000 for all of these injuries—painful, serious and permanent though they were.

When we consider each of these factors together with the deliberate and unfair tactics of defense counsel, we are convinced that substantial injustice has been done in this case. We emphasize that we think that the sort of strategy employed by defense counsel has no place in the federal district court. Creating a hostile atmo-

sphere toward parties on the basis that they are not local people contributes nothing—less than nothing—toward the search for justice and fairness and truth. Nor does deliberately misstating the record or arguing outside the record serve any remote purpose for which a trial is intended. But our strongly felt convictions notwithstanding, we would not reverse the district court in this case on the basis of these remarks alone, absent a timely objection.

We reverse because after reading the record, evaluating the evidence, reviewing the tactics of counsel, considering the unfair argument of counsel, and evaluating the ultimate verdict of the jury, we are fully convinced that the jury verdict is inconsistent with substantial justice within the meaning of Fed.R.Civ.P. 61, and that manifest injustice would result by allowing the jury verdict here to stand. We therefore hold that the district court abused its discretion in denying Hall a new trial. The judgment of the district court is reversed, and the case is remanded for a new trial.

REVERSED and REMANDED.